CatRon, Ch. J.
dissentienle. To comprehend the effect of the principle decided in this cause, it must be taken in connection with the points heretofore decided in other cases, upon the construction of the treaties of 1817 and 1819. First, on the necessity of the reservee having an improvement, and residing thereon at the time the treaty of 1819 was made. I was of opinion, in the cause of Pathkiller against Blair, such an improvement and residence, at the time of making the treaty, was necessary. Judges Whyte and Peck adjudged otherwise. Judge Whyte held, that Pathkiller might have selected the Peach tree place on which he resided, or any other of his improvements, or any other spot altogether unimproved. Judge Peck’s opinion is not reported, because not found in the files of the cause; but a copy thereof is filed in this cause from the Sparta Recorder of the eighteenth of September 1830. It holds, “That if the reservee has no improvement, he may, with the consent of the agent, select where he will take. If he has an improvement, all agree he may select it. But with the consent of the agent, for reasons to him satisfactory, he may depart from it, and agree upon another place.” In the case of West and Wife against Donoho, Judges Green and Catron ad *336 judged, that residence on the land claimed by the reservee on or before the first day of January 1820, was necessary to give identity, and title to the land. In this cause it is adjudged, by a majority of the court, that the registry of the name is conclusive evidence, that the person whose name has been registered is entitled to a reserve of six hundred and forty acres. That is, that he or she was the head of an Indian family, and resided within the ceded territory, as required by the treaties. By the constructions given on the different points litigated, the following is the proper reading of the treaties: To every person, who registered his or her name with the Cherokee agent, at any time after the making the treaty of 1817, and on or before the first day of January 1820, there shall be allowed six hundred and forty acres of land, at such place as such person may have designated; provided, he or she settled thereon on or before the first day of January 1820, the residence (when possession taken) to be as near the centre of a square as may be. As to the construction of the clause of the eighth article of .the treaty of 1817, providing, that if a party remove from his reservation, it shall revert to the United States, the court has uniformly held, that the “removal” must be voluntary, with an intention to abandon it. Having differed on most of the points adjudged, I feel it to be due to the country, to my brother judges, and to myself, to state what the construction of the treaties is settled to be by a majority of the court, so that the circuit courts may not be further mislead by any opinions of mine in conflict with what is above stated. I do not believe that the registry of the name is conclusive evidence that the person who regis--tered was the'head of an Indian family, and resided on the ceded territory. Each and every head of an Indian family residing on the ceded territory, those enrolled for the Arkansas excepted, had a right to give in his or her name to the agent, to be put on the register; but if the person was not the head of an Indian family, or did not *337 reside on the ceded territory, or had enrolled for the Arkansas, then the act of having the name put on the register was a fraud on the government, which is open to proof, and the claim to rejection. The agent had no power or authority conferred on him by the treaties, to judge who was, or who was not, the head of an Indian family, where the applicant resided, nor could he know whether he would enrol for the Arkansas, which might he an after act. His duty was to receive the names and put them on the list, and this was his practice, without enquiring how the fact was. In some instances, and not a few, almost the whole family, male and female, registered for reserves. In every cause that has come before this court, it has been thought necessary to prove, that the reservee was the head of an Indian family, residing on the ceded territory. In Luna Riley vs. Elliston, (reported in 2 Yerger’s Reports, 431,) a youth residing with his mother when the treaty of 1819 was made, married during the fall of 1819, registered his name, and settled on a tract of land lying oppposite Kingston, on the Holston. The facts were proved, and the court adjudged, “That Luna Riley not being, at the making of the treaty of 1819, the head of an Indian family, was, by the terms of the treaty, excluded, and the registration of his name for a reservation unauthorized.” The judgment of the circuit court was affirmed, and the purchaser from the State held the land. The cause was decided on the most extensive argument by the counsel for the State and the defendant, end on very mature consideration by the court, and I think it ought not to be overruled, as the court had much better opportunities then, than now, to consider the question, involved in almost every reserve cause in the supreme court at Knoxville. There was not one, where the proof was not required on part of the plaintiff, the reservee. If, however, Riley’s case was decided wrong, bo harm can result. He can bring a second ejectment, *338 having been turned off by the process of the State, with' out suit.
Judgment reversed.